373 B.R. 671 (2007)
In re GTI CAPITAL HOLDINGS, LLC, an Arizona limited liability company dba Rockland Materials, Debtor.
In re David M. Reaves, as the Chapter 7 Trustee of GTI Capital Holdings, LLC, an Arizona limited liability company dba Rockland Materials, Plaintiff,
v.
Comerica Bank-California, Defendant.
Bankruptcy Nos. 03-07923-SSC, 03-07924-SSC, Adversary No. 03-583.
United States Bankruptcy Court, D. Arizona.
August 2, 2007.
*672 Michael W. Carmel, Michael W. Carmel, Ltd., Phoenix, AZ, Debtor.
*673 Alan R. Costello, Costello Law Firm, Phoenix, AZ, for Plaintiff.
John R. Clemency, Greenberg Traurig LLP, Phoenix, AZ, Joseph J. Hamilton, Lashawn D. Jenkins, Quarles & Brady Streich Lang LLP, Phoenix, AZ, for Defendant.

MEMORANDUM DECISION
SARAH SHARER CURLEY, Bankruptcy Judge.

I. Introduction
This matter came before the Court on Defendant Comerica's Motion for Summary Judgment,[1] filed March 6, 2007. The Plaintiff, Chapter 7 Trustee David M. Reaves, filed his Response and Cross  Motion for Summary Judgment[2] on May 14, 2007, and Comerica filed its Reply and Response to Trustee's Cross-Motion[3] on May 29, 2007. On June 8, 2007, the Trustee filed his Reply to Comerica's Response.[4] Oral argument was held in the matter on June 13, 2007, at which time the Court took this matter under advisement. In this Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052, Rules of Bankruptcy Procedure. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 (West 2007).

II. Factual Discussion
Pursuant to a commitment letter signed on August 22, 2001, the predecessor in interest to Comerica made four loans to GTI Capital Holdings, L.L.C. (the "Debtor").[5] The loans were finalized on September 10, 2001, when the Debtor executed a promissory note and credit agreement for each loan, which included an authorization for Comerica to perfect its security interest in the collateral securing the loans. Pursuant to the credit agreements as to the revolving line of credit and the equipment loans, the Debtor granted Comerica a security interest in, among other things, substantially all of the Debtor's personal property. The loan proceeds were disbursed on September 10, 2001. However, on September 12, 2001, the creditor only recorded the Deed of Trust and, other documents related to the real estate loan. After Comerica acquired its interest in the loans, through merger, it filed the UCC-1 Financing. Statements ("UCC-1's")[6] for the other three loans on July 17, 2002. The parties derived estimates of the value of the Debtor's personal property in 2002 from the "Examiner's. Memorandum Regarding Surcharge, Estimation of Claims, and Value Allocation" ("Memorandum"), filed at Docket Entry No. 699 in the Debtor's administrative case docket on April 19, *674 2004. The Trustee ultimately relied on the actual post-petition value of the personal property, which netted approximately $2,176,814.69 for creditors, as the best evidence of value. Comerica, in contrast, relied more heavily on the Memorandum, adjusting its valuation further to reflect the value of the Debtor's personal property as of July 2002. The Memorandum estimated that in 2004, the value of the Debtor's equipment subject to Comerica's liens was $2,234,940; and the value of the rolling stock subject to the liens was $32,046. The Memorandum used a July 2, 2003 appraisal of the Debtor's personal property dope by Arizona Auctioneers as a starting point; the appraised value therein was $6,540,399. Comerica assumes that the correct valuation of the property as of July 2002 was $8,175,499 ($6,540,399 increased by 20%. This number is derived from the assumption that the property had depreciated by 20% between 2002 and 2003). The Court would have preferred expert testimony on such an issue. However; for purposes of this Decision, the Court has assumed that the Debtor's assets had a range in value between $2,176,814.69 and $8,175,499 in July 2002. On September 4, 2002, the Debtor and Comerica entered into a Modification Agreement under which, among other things, the Debtor received certain financial accommodations from Comerica.
On May 8, 2003, the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code. On June 17, 2003, the Debtor initiated this adversary proceeding with an eight-count Complaint against Comerica, alleging that Comerica's late filing of the UCC-1's constituted a preference or a fraudulent conveyance that should be avoided and recovered for the benefit of the estate. The First, Second, Seventh, and Eighth Causes of Action were dismissed by the Court in its January 17, 2006 Memorandum Decision.[7] The Court must now determine whether, under the remaining claims for relief, the filing of the UCC-1's constitutes a fraudulent conveyance pursuant to 11 U.S.C. §§ 544(b) and 548. The Section 544(b) claim for relief relies on various provisions of Arizona law. See A.R.S. §§ 44-1004 and 44-1005.

III. Legal Discussion
A motion for summary judgment should be granted if the movant has shown that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056(c). Ruling on a motion for summary judgment necessarily implicates that substantive evidentiary standard of proof which would apply at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. Procedurally, "the proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." In re Aquaslide `N' Dive Corp., 85 R.R. 545, 547 (9th Cir. BAP 1987). Once that burden has been met, "the opponent must affirmatively show that a material issue of fact remains in dispute." Frederick S. Wyle P.C. v. Texaco, Inc., 764 F2d 604, 608 (9th Cir.1985). The opponent may not assert the existence of some alleged factual dispute between the parties. Liberty Lobby, 477 U.S. 242 at 252, 106 S.Ct. 2505 at 2512, 91 L.Ed.2d 202. Instead, to demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge, and the facts set forth *675 therein must be admissible in evidence. Aquaslide, at 547. In addition, summary judgment must be used with care and restraint, Hutchinson v. United States, 677 F.2d 1322, 1325 (9th Cir.1982), and is reviewed in the light most favorable to the non-moving party. Hifai v. Shell Oil Co., 704 F.2d 1425, 1428 (9th Cir.1983).
The Trustee now concedes that there is no basis to proceed against Comerica under 11 U.S.C. § 548(a)(1)(A), which requires a Court to find an actual intent to hinder, delay, or defraud creditors, an intent that is ostensibly lacking in the case at bar. Therefore, this particular claim, Count 3 of the Complaint, should be dismissed. The parties' dispute now revolves around 11 U.S.C. § 548(a)(1)(B)(ii)(I), which allows a trustee to avoid the transfer of a debtor's interest in property that was made on or within one year before the date of the filing of the debtor's petition if the debtor (1) received less than reasonably equivalent value in exchange for the transfer or obligation; and (2) was insolvent or became insolvent as a result of the transfer.
A. The Transfer at Issue Occurred on July 17, 2002
The Bankruptcy Code's definition of "transfer" is very broad. A "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(54). Under both the Code and state law, the "granting of security for a debt is a transfer." In re Lawson, 122 F.3d 1237, 1240 (9th Cir.1997); In re Main, 75 B.R. 322, 326 (Bankr.D.Ariz.1987), declined to follow on time of transfer reasoning by In re Ehring, 91 B.R. 897, 901 (9th Cir. BAP 1988). A transfer occurs, for purposes of Section 548, "when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee." 11 U.S.C. § 548(d)(1). Similarly, under Arizona law, a transfer of personal property occurs when "the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien through attachment, garnishment levy or other process . . . that is superior to the interest of the transferee." A.R.S. § 44-1006.
Under these definitions, the creditor's funding of the loans to the Debtor on September 10, 2001, and the filing of the UCC-1's on July 17, 2002 were separate transfers. On September 10, 2001, Comerica's predecessor in interest provided financing to the Debtor, and in return, the Debtor gave various promissory notes to Comerica, obligating itself to pay the creditor. The second transfer (the "Transfer"), the one to be avoided under the Trustee's Complaint, was completed on July 17, 2002, when Comerica filed the TJCC-1's that the Debtor had authorized Comerica's predecessor to file on September 10, 2001. On July 17, 2002, the Debtor gave Comerica a security interest in its personal property that was so far perfect ed that a bona fide purchaser from the Debtor could not acquire an interest or lien superior to Comerica's. See A.R.S. §§ 47-9308, 47-9310(A). The date of July 17, 2002 falls within one year of the Debtor's petition filing date; therefore, the Transfer may be avoided by the Trustee, if all other Section 548 criteria are satisfied.
B. The Debtor Received Reasonably Equivalent Value in Exchange for the Transfer.
A two-step analysis is necessary to determine whether a debtor has received *676 reasonably equivalent value in exchange for its transfer of an interest in its property to another. First, it must be shown that the debtor received value; secondly, the Court must determine whether that value was reasonably equivalent to what the debtor gave up. In re United Energy Corp., 944 F.2d 589, 597 (9th Cir.1991); In re Anand, 239 B.R. 511, 517 (N.D.Ill.1999).
1. The Debtor Received "Value".
For purposes of fraudulent transfer analysis, "`value' means property, or satisfaction or securing of a present or antecedent debt or the debtor." 11 U.S.C. 548(d)(2)(A). "There is no dispute that the collateralization of an antecedent debt confers value on the debtor." In re Anand, 239 B.R. 511, 517 (N.D.Ill.1999); see In re United Energy Corp., 944 F.2d 589, 597 (9th Cir.1991) (holding that "value" for purposes of Section 548 includes the securing of an antecedent debt, in contrast to Section 547, under which the securing of an antecedent debt is not value).
The Trustee argues that any value received by the Debtor in the form of securing an antecedent debt was illusory. The Trustee relies on the case of In re Viscount Air, 232 B.R. 416 (Bankr.D.Ariz. 1998). In the Viscount case, the debtor transferred two airplanes and other equipment to a buyer in exchange for the buyer taking over all of the debtor's obligations to a third party under the debtor's lease of the planes, and the buyer's guaranteeing certain rent obligations of the debtor to another party, Turbo Aire Holdings. Id. at 435. The Court held that the debtor did not receive reasonably equivalent value, because, despite the guarantee, Turbo Aire Holdings filed a claim against the Debtor for unpaid rent in the debtor's bankruptcy. Also, the lessor of the planes never released the debtor from its obligation under the leases, so the "value" the debtor was to have received in exchange for the planes and equipment was illusory. Id. at 437; see also Mellon Bank N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc., 92 F.3d 139 (3rd Cir.1996) (holding that a bank's highly conditional commitment letter for a loan that had a de minimis chance of closing, given in exchange for fees paid by the debtor for the drafting of the letter, was not "value"); In re General Search.com, 322 B.R. 836 (BanknN.D.Ill.2005)(holding that a debtor received no reasonably equivalent value when it cancelled $200,000 of a client's receivables balance due and owing to the debtor, in order to receive the client's remaining receivables balance in an expeditious manner).
Such illusory value cases are factually and legally distinguishable from the case at bar. Unlike the debtor in Viscount Air, where the value given to the debtor became illusory when the counterparty apparently breached its obligations, the Debtor in this case, secured an antecedent debt in the amount of the value, of its personal property. Such statutorily-defined value cannot be illusory.
Comerica requests that the Court adopt a per se rule under Section 548(d). If "a debtor grants a security interest to a creditor, the debtor receives reasonably equivalent value by securing the antecedent debt. Comerica argues that the case of In re Anand dictates such a rule when it speculates that because a security interest is "pegged to the value of the secured assets; a high degree of equivalence between the two values is, therefore, a safe assumption." 239 B.R. at 517-18. However, the Anand Court expressly declined to adopt a per se rule, stating that the determination of reasonably equivalent value was a "slippery one" that had to be made on a case by case basis. See Id. at 518. A per se rule would be contrary to *677 Ninth Circuit law as well, which holds that the determination of "reasonably equivalent value" is a factual question to be decided on the facts of each case. In re United Energy Corp., 944 F.2d 589, 597 (9th Cir.1991); In re Maddalena, 176 B.R. 551, 554-55 (Bankr.C.D.Cal.1995). The Court declines to adopt a per se rule, and instead examines the facts of the instant case to determine whether the Debtor received reasonably equivalent value for collateralizing Comerica's loan.
2. The Value the Debtor Received Was "Reasonably Equivalent" to What it Exchanged.
"[R]easonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value if it gets roughly the value it gave." VFB LLC v. Campbell's Soup Co., 482 F.3d 624, 631 (3rd Cir.2007) (internal citation omitted). The determination is to be made from the standpoint of the debtor's creditors, not from the purchaser's standpoint, and must be made as of the time of the transfer. In re United Energy Corp., 944 F.2d at 597; Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc., 92 F.3d 139, 151-52 (3rd Cir.1996); In re Mussa, 215 B.R. 158, 172 (Bankr.N.D.Ill. 1997). "The focus is whether the net effect of the transaction has depleted the bankruptcy estate." In re Viscount Air Services, Inc., 232 B.R. 416, 435 (Bankr. D.Ariz.1998).
The parties rely heavily on In re Anand, 239 B.R. 511, 517 (N.D.Ill.1999). Mr. Anand refinanced prior debt to receive (1) new bank loans, totaling $260,000, and secured by his home and another parcel of real estate, (2) the bank's agreement to forbear from enforcing its rights against him, (3) its agreement to extend the maturity date on a note, and (4) its waiver of a $50,000 principal reduction payment. Upon the filing of his bankruptcy petition, Anand attempted to avoid the transfers to the bank of the interests in his real property as fraudulent transfers. The Anand Court held that a court must first determine whether the debtor received value; and second, the court must determine whether the value is "reasonably equivalent" to what the Debtor gave up. The Anand court found that the $260,000 loan, accompanied by the other financial accommodations, constituted reasonably equivalent value for the security interest in the two properties. Although the Court never noted the dollar value of the properties, it reasoned that a security interest is generally likely to be roughly equivalent to the value of the property it secures. Id. at 518.
Although it is undisputed that the Debtor received statutorily-defined value, the Trustee argues that the value was not reasonably equivalent to the security interest the Debtor gave to Comerica. He would have the Court adopt the view that the granting of a security interest confers reasonably equivalent value on the transferor only when accompanied by other value, such as the various financial accommodations the bank offered to Anand.[8] Most *678 of the cases examining security interests as reasonably equivalent value for the securing of an antecedent debt have involved some other value accruing to the debtor. See, e.g., In re AppliedTheory Corp., 330 B.R. 362, 363-64 (S.D.N.Y.2005) (debtor received reasonably equivalent value when it offered an $18 million security interest in its assets to secure a $30 million antecedent debt, and was also granted a $6 million credit line); In re Anand, 210 B.R. 456, 460 (Bankr.N.D.Ill.1997), aff'd 239 B.R. 511 (N.D.Ill.1999) (debtor received reasonably equivalent value when it secured a prior loan; however, the lender also gave the debtor a new loan and various financial accommodations); In re Southmark, 138 B.R. 820, 829 (Bankr. N.D.Tex.1992) (debtor received reasonably equivalent value when it gave a security interest in $45,000,000 of, stock in exchange for a supersedeas bond worth $34,119, 194.40); Cf. In re Countdown of Connecticut, Inc., 115 B.R. 18, 21 (Bankr.D.Conn. 1990) (holding that whether debtor received reasonably equivalent value when it gave a security interest worth $3,000,000 in its assets to a creditor was a question of fact not appropriate for summary judgment when it was unknown whether the debtor had pledged all of its assets). Additional value is generally given because debtors do not spontaneously secure antecedent debt; rather, some additional incentive is usually necessary.[9]
Such "new value" was not received in this case;[10] however, "new value" is not necessary. A debtor can receive reasonably equivalent value for the securing of an antecedent debt without receiving any "new value." In re Kaplan Breslaw Ash, L.L.C., 264 RR. 309, 328-30 (Bankr. S.D.N.Y.2001) (holding that the debtor received reasonably equivalent value solely by securing a $2,250,000 antecedent debt with a $700,000 mortgage on a warehouse and declining to examine whether the debtor had received any other value, as such other value was unnecessary to the fraudulent transfer analysis); Anand at 518 (affirming bankruptcy court's conclusion that based upon the facts of the case, securing antecedent debt constituted reasonably equivalent value as a matter of law); see United Energy, 944 F.2d 589, 596 (9th Cir.1991) (reminding that the law of preferences should not be confused with that of fraudulent transfers).
The remaining cases on which the Trustee relies are factually distinguishable from the case at bar. In the case of Barber v. Golden Seed Co., Inc., 129 F.3d 382 (7th Cir.1997), the Seventh Circuit held that the debtor received" reasonably equivalent value when it sold seed to a producer for a certain price, even though it could have sold the seed for double the price to wholesalers.. The relevant market was the grower-producer market, not the grower-wholesale market. This Court is not analyzing various commodity markets to ascertain reasonably equivalent value. As to the decision of In re Mussa, 215 B.R. 158 (Bankr.N.D.Ill.1997), the Court held that the debtors' son's promise to support the debtors, assume unproven debt, and assume a $50,000 mortgage was *679 not reasonably equivalent value exchanged for the debtors' transfer of more than $523,000 to the son. However, in that case, the value received by the debtor was disproportionately small to what the debtor gave to his son. Here, the Court is unable to conclude on this record that the value received by the debtor was disproportionate to what it gave.
Another case cited by the parties, which the Court finds instructive, is the Ninth Circuit decision of In re United Energy Corp., 944 F.2d, 589 (9th Cir.1991). The United Energy case involved a Ponzi scheme in which investors purchased solar power-producing modules, and were to receive payments based on the power output of their modules. The preliminary investors received some payments (which, unbeknownst to them, were not generated through power production), because the scheme had to appear profitable to induce other investors to participate. After the scheme was uncovered, United Energy filed for bankruptcy protection, and the trustee attempted to recover the "power" payments to the preliminary investors as fraudulent transfers. Id. at 591. The Ninth Circuit, affirming the Bankruptcy Appellate Panel and reversing the bankruptcy court, held that the payments were not fraudulent transfers. Id. at 593, 597. The Ninth Circuit reasoned that the preliminary investors held claims against the estate for fraud, rescission, and/or restitution ("fraud claims"). These were antecedent debts. Id. at 596. When the preliminary investors received the "power" payments, said payments were separate transfers in satisfaction of the antecedent debts. Id. The payments reduced the debtor's liability on the fraud claims; therefore, the estate had received reasonably equivalent value in the amount by which the fraud claims were reduced. Id. The Ninth Circuit recognized that such a holding preferred the preliminary investors over later investors who had not received "power" payments; however, it stated that the Congressional intent behind, and operation of, Section 548,' the fraudulent transfer provision, were separate and apart from Section 547, which disallows preferences. Id. at 597.
In the case at bar, Comerica's predecessor in interest loaned the Debtor approximately $12.75 million that was to be secured by the Debtor's personal property.[11] Later, Comerica secured that loan by taking a security interest in the Debtor's personal property, as the Debtor had authorized Comerica's predecessor to do at the time the Debtor received the money. In exchange for the security interest it gave the creditor, the Debtor received "value" from having secured the creditor's loan in an amount roughly equal to the value of the Debtor's personal property. See 11 U.S.C. § 548(d). The parties have presented various valuations of said property when it was sold after the bankruptcy filing, which place a value on the personal property between approximately $2,176,814.69 and $8,175,499.00.[12] No matter which valuation of the Debtor's property is deemed most accurate, the Debtor received "reasonably equivalent" value when it secured the creditor's $12.75 million antecedent debt, because the amount of the loans secured equaled or exceeded *680 the value of the Debtor's property.[13]See In re Kaplan Breslaw Ash, L.L.C., 264 B.R. 309, 328-30 (Bankr.S.D.N.Y.2001); In re Anand, 239 B.R. 511, 517 (N.D.Ill.1999).
The Trustee argues that such a result injures unsecured creditors of the estate, from whose standpoint the Court must analyze the transfer at issue. See United Energy, 944 F.2d 589 (9th Cir.1991). He argues that assets that could have become part of the bankruptcy estate, were, instead, pledged to a secured creditor. However, Section 548 states that a debtor's granting of a security interest in its assets constitutes "value."[14] Under that Section, even if Comerica loaned the Debtor $12.75 million without receiving (or contemplating receiving) a security interest in the Debtor's assets, and the Debtor later secured that loan unexpectedly, the Debtor would have received reasonably equivalent value under Section 548 of the Code, if the collateral securing the antecedent debt was equal to, or less than, the amount of the debt.
Furthermore, no unsecured creditors of the Debtor were arguably harmed by the transfer. If the creditors were disinclined to extend credit to the Debtor, said creditors could have acquired a lien on the Debtor's personal property prior to July 17, 2002, or refused to provide further goods or services. Afterward, the UCC-1's filed on the Debtor's personal property em bled such creditors to make an informed decision whether to extend credit. The net effect of the transfer did not harm the Debtor's unsecured creditors.
Although the Trustee argues that some new value was necessary for the Transfer to be deemed reasonably equivalent, "new value" is a preference defense; and the Ninth Circuit in United Energy admonished the parties that preference law must not be confused with fraudulent transfer law. Id. at 596. Rather than examining whether "new value" was received, the Court must look to whether the value given was reasonably equivalent to the value received. Amounts do not have to be "dollar-for-dollar" to be reasonably equivalent. See BFP v. Resolution Trust Corp., 511 U.S. 531, 536-37, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994). However, here, the Debtor did roughly receive a dollar-for-dollar value exchange. Comerica received a security interest in the Debtor's personal property, and the Debtor received the value of having secured the antecedent debt acquired by Comerica in an amount that was equal to the value of the personal property. See Kaplan at 330; Anand, 210 B.R. at 460. If, on July 17, 2002, the Debtor's personal property was worth $2,176,814.69, it received the value of securing an antecedent $12.75 million debt in the amount of $2,176,814.69; if the assets were worth $8,175,499.00, the Debtor received the value of securing the same *681 antecedent debt with $8,175,499.00 in personal property.
Moreover, although the July Transfer must be analyzed separately from the September transfer for purposes of legal analysis, the two transfers constitute a single transaction from a practical standpoint. Fraudulent transfer analysis under Section 548 requires the Court to analyze the transfer from a practical standpoint, by looking at the net effect of the transfer on unsecured creditors. See United Energy, 944 F.2d 589, 597 (9th Cir.1991). The Debtor received $12.75 million, and pledged a security interest in its personal property to receive that financing. Legally, the September 10, 2001 transfer, when the Debtor received the money, was a separate transaction from the July 17, 2002 Transfer when Comerica filed the UCC-1's. However, this construction overlooks the fact that the September transfer would never have occurred if the Debtor had not promised to Comerica's predecessor, among other things, a security interest in the Debtor's personal property. If the Debtor had not promised to grant the security interest to the creditor, the future estate would not have been increased by some $12.75 million; similarly, had the Debtor later refused to perfect the security interest to Comerica in July 2002, Comerica likely would have sued the Debtor for breach of the September loan contract, creating a significant liability for the estate. See United Energy, 944 F.2d 589, 597 (9th Cir.1991) (holding that payments, while not expressly made in satisfaction of fraud claims, which reduced the liability of the estate on potential fraud claims ultimately benefitted the unsecured creditors of the estate). Certainly unsecured creditors of the estate would have received a windfall had Comerica never taken the security interest to which it was entitled. The Court cannot undo a legitimate transfer in order to create such a windfall. The Debtor received reasonably equivalent value, and the Transfer cannot be set aside as fraudulent.[15]
Similarly, the Trustee's claims under Arizona's version of the Uniform Fraudulent Transfer Act, A.R.S. §§ 44-1004 and 44-1005, fail. See Mann v. GTCR Golder Rauner, L.L.C., 483 F.Supp.2d 884, 918 (D.Ariz.2007). The Court's conclusion regarding the 11 U.S.C. § 548 claim applies to the state law claims pursuant to A.R.S. §§ 44-1004 and 44-1005. See e.g., In re Hinsley, 201 F.3d 638, 643 (5th Cir.2000) (holding that because the. Uniform Fraudulent Transfer Act adopted its "reasonably equivalent value" from 11 U.S.C. 548 with the intent to harmonize state and bankruptcy law, the phrase is interpreted similarly between the Act and the Code); In re Image Worldwide, Ltd., 139 F.3d 574, 577 (7th Cir.1998) (holding that the phrase "reasonably equivalent value" is interpreted similarly between Uniform Fraudulent Transfer Act and Code).

IV. Conclusion
Based upon the foregoing analysis, Comerica's Motion for Summary Judgment is granted; the Trustee's Cross Motion for Summary Judgment is denied. Because all claims in this adversary proceeding have now been resolved adversely to the Trustee, or the Trustee has conceded that a claim is no longer viable,[16] the Court *682 shall dismiss this adversary proceeding with prejudice
NOTES
[1] Docket Entry No. 51. The Motion sought to dispose of the Third, Fourth, Fifth, and Sixth Causes of Action in the First Amended Complaint filed by the Debtor, GTI Capital Holdings, L.L.C., on February 25, 2004.
[2] Docket Entry No. 58. The Complaint and Motion for Summary Judgment named GTI Capital Holdings, L.L.C., the Debtor, as the Plaintiff. When the Debtor's Chapter 11 administrative case was converted to one under Chapter 7 on April 30, 2007, the Chapter 7 Trustee, David M. Reaves, was substituted in as the Plaintiff.
[3] Docket Entry No. 62.
[4] Docket Entry No. 63.
[5] Imperial Bank made the loans and entered into the various loan agreements with the Debtor. However, Comerica succeeded, by merger, to Imperial Bank's position. The loans were as follows: (1) A revolving line of credit with a maximum commitment of $4.5 million; (2) An equipment term loan in the amount of $6.75 million; (3) An equipment loan in the amount of $1.5 million; and (4) A real estate loan in the amount of $8.5 million.
[6] The document numbers on file with the Arizona Secretary of State were XXXXXXXXXXXX and XXXXXXXXXXXX.
[7] Dkt. Entry No. 34.
[8] The District Court's Anand opinion notes that often "other value" is received in addition to the debtor's having secured an antecedent debt. "This is because debtors generally do not collateralize an antecedent debt unless they are in default. . . . Consequently, the debtor often receives forbearance or other consideration when he secures the debt." 239 B.R. at 518. However, the opinion also noted that it, could "find no flaws" in the bankruptcy judge's conclusion that Anand received reasonably equivalent value, as a matter of law, for the granting of the security interests, when he received the value of having secured the debt he previously received, without examining any other value. Because Seventh Circuit law required an analysis of "all the facts of each case," the District Court did examine the other value that the Bankruptcy Court had not scrutinized. Id.
[9] See supra, n. 8.
[10] Comerica and the Debtor did enter into a Modification Agreement some 49 days after the filing of the UCC-1s. However, it is clear that this Agreement was entered into well after the Transfer at issue was concluded. There is no dispute that the Modification Agreement was not negotiated or contemplated as consideration for the Transfer at issue, and as such, whatever value the Debtor would or did receive under that Agreement is irrelevant to, the fraudulent transfer analysis.
[11] This amount excludes the amount loaned under the real estate loan, for which the Debtor's personal property did not serve as collateral.
[12] The $2,176, 814.69 value is based on the post-petition sale proceeds of the property. Comerica asserts that the true value of the property in 2002, when the UCC-1's were filed, was $8,175,499.
[13] The parties presented no evidence as to whether the loans' amounts increased or decreased over the time period from the initial funding to the filing of the UCC-1's; rather, their pleadings and arguments assumed that $12.75 million, the original amount of the loans, was outstanding at the time of the filing of the UCC-1's.
[14] The District Court in the Anand case recognized that Section 548 is counterintuitive. 239 B.R. at 518, n. 5. The Code's mandate that value includes a debtor's securing of an antecedent debt seems illogical, because the debtor receives nothing by securing the debt and actually gives away collateral. Id., quoting Steven L. Schwarcz, Rethinking Freedom of Contract: A Bankruptcy Paradigm, 77 Tex. L.Rev. 515, 592-93 (1999), However, the result is likely founded in the history of fraudulent conveyance law, which was intended to . discourage fraud; securing a debt is not fraudulent, and may facilitate a debtor's ability to reorganize. Id., quoting Schwarcz, supra.
[15] Because the Court finds that reasonably equivalent value was exchanged, the Transfer cannot be set aside, and the Court need not reach the question of whether the Debtor was insolvent on July 17, 2002.
[16] As noted previously, the Trustee no longer wishes to pursue a transfer under 11 U.S.C. § 548(a)(1)(A).